**United States Court of Appeals**

**FOR THE EIGHTH CIRCUIT**

_____

No. 96-1098

_____

| | | |
|---|---|---|
| Excalibur Group, Inc., a Minnesota Corporation, | * * * | |
| Plaintiff - Appellant, | * * | Appeal from the United States District Court for the |
| v. | * * | District of Minnesota. |
| City of Minneapolis, | * * | |
| Defendant - Appellee. | * | |

_____

Submitted:  November 20, 1996

Filed:       June 24, 1997

_____

Before FAGG, WOLLMAN, and HANSEN, Circuit Judges.
_____


HANSEN, Circuit Judge.

     The Excalibur Group, Inc., (Excalibur) operates an adult bookstore, Sex World, in downtown Minneapolis, Minnesota.  Excalibur brought this action, seeking declaratory and injunctive relief on the basis that certain portions of Minneapolis Code

of Ordinances § 540.410, which regulates adults-only businesses, are unconstitutional under the First and Fourteenth Amendments of the United States Constitution.  The district court[1] granted summary judgment to the City of Minneapolis, and we affirm.

I.

**A.  General Background of Section 540.410**

Over twenty years ago, the City of Minneapolis (the city) enacted Minneapolis Code of Ordinances § 540.410, a zoning ordinance regulating adults-only businesses.  In 1986, the city amended the ordinance for the third time, adding the provisions challenged in this case.  The creation of section 540.410 and its amendments involved the sensitive balancing of the adults-only businesses' interest in free speech with the city's interest in minimizing the adverse secondary effects caused by those businesses.  In the process of enacting the 1986 amendment, the city held several public hearings, giving citizens, business owners, civic leaders, and community organizations an opportunity to voice their opinions about the ordinance.

In addition to conducting the hearings, the city directed its Planning Department Staff (the staff) to study various empirical studies of other cities regarding the effects of adults-only businesses on their surrounding areas.[2]  The Indianapolis study, the results of which were similar to those in the other studies, found that adults-only businesses adversely impacted the areas surrounding adults-only businesses in numerous ways.  The incidence of major crimes in surrounding areas was 23 percent

---

[1]The Honorable Michael J. Davis, United States District Judge for the District of Minnesota.

[2]The staff looked at studies performed in Seattle, Washington; Chicago, Illinois; Los Angeles, California; Indianapolis, Indiana; and Portland, Oregon.  (Appellant's App. at 85.)

higher than in other areas, and sex-related crimes occurred almost twice as often. Housing values appreciated at only half the rate as values in other areas of the city, and property turnover was substantially higher. The evidence of these and other deleterious effects, as well as the testimony received at the hearings, convinced the staff that the downtown area in Minneapolis was best able to "buffer" the impact of adult businesses on surrounding neighborhoods. The staff recommended enacting the proposed amendment to "control the adverse impacts on residentially zoned areas and the City's fragile strip and neighborhood commercial areas." (Appellant's App. at 85.)

In addition to the restrictions on location, the staff proposed an amendment regulating the signs identifying the adults-only businesses and prohibiting the display of their merchandise in a manner that would be visible from the sidewalk in front of the establishments. The staff felt that controlling the appearance and image of the sexually oriented businesses would make the locational restrictions more effective in minimizing the blighting impact of adults-only businesses.

The staff's findings and recommendations were adopted by the Minneapolis City Planning Commission, and the city ultimately enacted the proposed amendments. Subsection (a) of the amended ordinance states the city's objectives for the restrictions found therein:

> In the development and execution of this section, it is recognized that there are some uses which, because of their very nature, are recognized as having serious objectionable operational characteristics, particularly when several of them are concentrated under certain circumstances thereby having a deleterious effect upon the use and enjoyment of adjacent areas. Special regulation of these uses is necessary to insure that these adverse effects will not contribute to the blighting or downgrading of the surrounding neighborhood. . . . The primary control or regulation is for the purpose of preventing a concentration of these uses in any one area.

Minneapolis, Minn., Code of Ordinances § 540.410(a).

It was not long before the locational restrictions in the ordinance were challenged as unconstitutional abridgments on speech. We upheld those restrictions, finding them to be permissible regulations on the time, place and manner of the adults-only businesses' speech. Alexander v. City of Minneapolis, 928 F.2d 278, 283-84 (8th Cir. 1991).

We now address a constitutional challenge to the sign requirements, which are codified in subsection (g) of the ordinance:

> *(g) Sign requirements for all uses.* All new regulated uses, and all existing regulated uses by December 1, 1988, shall comply with the following sign requirements:
>
> > (1) All signs shall be flat wall signs.
> >
> > (2) The amount of allowable sign area shall be one square foot of sign area per foot of lot frontage on a street.
> >
> > (3) No merchandise or pictures of the products or entertainment on the premises shall be displayed in window areas or any area where they can be viewed from the sidewalk in front of the building.
> >
> > (4) Window areas shall not be covered or made opaque in any way. No signs shall be placed in any window. A one-square-foot sign may be placed on the door to state hours of operation and admittance to adults only.

Minneapolis, Minn., Code of Ordinances § 540.410(g). Excalibur contends that subsection (g)(3) is overbroad and subsection (g)(4) is unconstitutional on its face and as applied to Excalibur.

4

**B. Procedural Background**

After receiving notification from the city zoning inspector that it was in violation of subsections (g)(3) and (g)(4), Excalibur brought this declaratory judgment action in federal court, arguing that subsection (g)(4) of the above ordinance is facially unconstitutional and unconstitutional as applied to Excalibur.[3] Excalibur then filed a motion seeking a temporary restraining order and a preliminary injunction. After conducting a hearing, the district court denied Excalibur's motion, concluding Excalibur was unlikely to succeed on the merits of its claims.

Subsequently, the city filed criminal charges against Dennis Buchanan, who operates Sex World, and the owner of another adult bookstore for violations of sections 541.410(g)(3) and (g)(4). The defendants were found guilty as charged, and the Minnesota Court of Appeals affirmed the convictions. See State v. Holmberg, 545 N.W.2d 65, 74 (Minn. Ct. App. 1996).

While the criminal case was still pending, however, the city brought a motion for summary judgment on the merits of the declaratory judgment action. In Excalibur's memorandum in opposition to the city's motion, Excalibur argued the claims submitted in its original complaint, as well as an additional claim that section 540.410(g)(3) is unconstitutionally overbroad. The district court addressed all of Excalibur's claims, found them lacking in merit, and granted the city's motion for summary judgment. This appeal followed.

---

[3]Excalibur also challenged the constitutionality of § 34.60(a)(1) of the Minneapolis Code of Ordinances, which requires approval from the Heritage Preservation Commission prior to the placement of signs on certain buildings. The district court held that this ordinance is not applicable to window signs and that Excalibur had no meritorious First Amendment claim against the ordinance. The parties do not appeal that holding.

## II.

We review the district court's grant of summary judgment de novo, using the same standard under Federal Rule of Civil Procedure 56(c) as applied by the district court. Toney v. WCCO Television, Midwest Cable & Satellite, Inc., 85 F.3d 383, 386 (8th Cir. 1996). Under Rule 56(c), summary judgment is warranted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

The material facts in this case are undisputed. Further, the parties agree that Sex World is an adults-only bookstore and therefore subject to the regulations in section 540.541. See Minneapolis, Minn., Code of Ordinances § 540.410(a), (b)(1). The parties also agree that Excalibur is entitled to free-speech protections under the First and Fourteenth Amendments. See Schad v. Borough of Mt. Ephraim, 452 U.S. 61, 65-66 (1981) (recognizing First Amendment protection for sexually explicit speech that is not "obscene"); 44 Liquormart, Inc. v. Rhode Island, 116 S. Ct. 1495, 1515 (1996) (noting that the Fourteenth Amendment extends First Amendment protection to state and local levels). Thus, we limit our inquiry to the legal question of whether the challenged portions of the ordinance are unconstitutional restrictions on free speech.

### A. Section 540.410(g)(4)

Excalibur contends that section 540.410(g)(4) unconstitutionally infringes on Excalibur's First Amendment rights. Because the ordinance does not create an absolute ban on speech, it is "`properly analyzed as a form of time, place, and manner regulation.'" ILQ Invs., Inc. v. City of Rochester, 25 F.3d 1413, 1416 (8th Cir.) (quoting City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 46 (1986)), cert. denied, 513 U.S. 1017 (1994). Time, place, and manner regulations are constitutional under First Amendment jurisprudence if (1) they "are justified without reference to the

content of the regulated speech," (2) "they are narrowly tailored to serve a significant governmental interest," and (3) "they leave open ample alternative channels for communication of the information." Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (internal quotations omitted).

We first consider whether section 540.410(g)(4) is content-neutral. A regulation is content-neutral if it is "justified without reference to the content of the regulated speech." Id. (emphasis and internal quotations omitted). Such a regulation is neutral "even if it has an incidental effect on some speakers or messages but not others." Id. (citing Renton, 475 U.S. at 47-48). Thus, at this point in the analysis, we focus on the city's purpose for enacting the ordinance. Id.; ILQ Invs., Inc., 25 F.3d at 1416.

The purpose statement in section 540.410(a) indicates that the city enacted the ordinance to minimize the adverse impacts of the sexually oriented businesses on the surrounding areas. Specifically, the city recognized that "serious objectionable operational characteristics [of sexually oriented businesses have] a deleterious effect upon the use and enjoyment of adjacent areas" and enacted section 540.410 "to ensure that these adverse effects will not contribute to the blighting or downgrading of the surrounding neighborhood." Minneapolis, Minn., Code of Ordinances § 540.541(a). This purpose of eliminating "secondary effects" that are unrelated to the content of the restricted speech renders section 540.410 a content-neutral ordinance. See Renton, 475 U.S. at 47-48. Cf. Alexander, 928 F.2d at 282-83 (assuming section 540.410 was content-neutral and noting that the plaintiff was not appealing the district court's decision reaching this conclusion).

Excalibur argues that the secondary-effects justification for section 540.410 applies only to the locational restrictions in the ordinance, not to the sign requirements in subsection (g)(4) of the ordinance. We reject this argument, because the purpose statement in subsection (a) is clearly intended to explain the basis for all of the provisions in the ordinance. While the purpose statement specifically notes that the

7

ordinance seeks to prevent a concentration of adults-only businesses in any one area, the concern about the adverse impacts of the adults-only businesses and the intent to minimize those impacts applies to all of the substantive provisions of section 540.410.

Excalibur also contends the legislative history of the ordinance does not support the city's claim that the purpose of the sign restrictions was to minimize secondary effects.  Relying on a report made by the staff of the City Planning Commission and adopted by the Commission, Excalibur argues the city was merely trying to further aesthetic objectives by creating the sign restrictions.  See Ward, 491 U.S. at 793 (noting that regulation to further purely aesthetic goals would "raise serious First Amendment concerns").  The report reads:  "The Downtown is best able to `buffer' the impact of adult uses on surrounding properties.  This would be even more effective if design controls were included to control the appearance and image of adult businesses."  (Appellee's App. at A21.)  While this report indicates that the city aimed the sign requirements at the outward appearance of the adults-only businesses, this regulation was a legitimate means to serve the city's overall secondary-effects objective -- minimizing the adverse effects these businesses have on surrounding areas.  The city's secondary-effects justification is unrelated to the content of any signs, and the sign regulation has no content restrictions.  Section 540.410(g)(4) is therefore a content-neutral regulation.

We next consider whether subsection (g)(4) was "narrowly tailored to serve a significant governmental interest."  Ward, 491 U.S. at 791; see also Renton, 475 U.S. at 47 (stating that the regulation must be "designed to serve a substantial governmental interest").  The question of whether the ordinance serves a significant governmental interest is easily resolved, because, as a matter of settled law, regulations aimed at minimizing the secondary effects of sexually oriented businesses serve a significant and substantial governmental interest.  See, e.g., Renton, 475 U.S. at 50; ILQ Invs., Inc., 25 F.3d at 1416; Holmberg v. City of Ramsey, 12 F.3d 140, 143 (8th Cir. 1993), cert. denied, 513 U.S. 810 (1994); see also Young v. American Mini Theatres, Inc., 427

8

U.S. 50, 71 (1976) (plurality opinion) ("[T]he city's interest in attempting to preserve the quality of life is one that must be accorded high respect.").  Furthermore, this record, which includes studies of several cities and evidence obtained at the hearings held by the City of Minneapolis, indicates that the city had substantial evidence on which to base its conclusions about the secondary effects of adults-only businesses. See Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 665-66 (1994) (explaining that legislative predictive judgments are entitled to deference in the First Amendment context of content-neutral regulation as long as the conclusions are "reasonable inferences based on substantial evidence"); Renton, 475 U.S. at 51-52 ("The First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.").  The issue thus narrows to whether the sign restrictions in subsection (g)(4) are themselves narrowly tailored to serve the city's significant interest.

To be "narrowly tailored" in this context, the regulation need not be the least restrictive means of serving the city's content-neutral interest.  Ward, 491 U.S. at 797; Van Bergen v. Minnesota, 59 F.3d 1541, 1555 n.13 (8th Cir. 1995).  "[T]he requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial interest that would be achieved less effectively absent the regulation" and the means chosen does not "burden substantially more speech than is necessary to further" the city's content-neutral interest.  Ward, 491 U.S. at 799 (internal quotations omitted); see also Turner Broad., Inc. v. FCC, 117 S. Ct. 1174, 1186 (1997) (citing United States v. O'Brien, 391 U.S. 367, 377 (1968)).  "[T]he validity of the regulation depends on the relation it bears to the overall problem the [city] seeks to correct, not on the extent to which it furthers the [city's] interests in an individual case."  Ward, 491 U.S. at 801.  We will not strike down a time, place, or manner regulation merely because we can envision a less-restrictive or more effective means of furthering the city's content-neutral objectives.  Ward, 491 U.S. at 800.

9

The city sought to minimize the blighting caused by adult-only businesses in two ways. First, the city required the adults-only businesses to operate within a specifically zoned area in downtown Minneapolis, the area "best able to `buffer' the impact of adult uses on surrounding properties." (Appellee's App. at A21.) Second, the city attempted to minimize the visual impact of the businesses on the neighborhood by regulating the signs on the businesses' premises. This second remedy stemmed from a belief that the locational limitations would "be even more effective if design controls were included to control the appearance and image of adult businesses." (Id.)

The design controls that Excalibur challenges impose some modest restrictions on the external appearance of adults-only businesses. See Minneapolis, Minn., Code of Ordinances § 540.410(g)(4). Window areas may not be covered or made opaque, nor are signs permitted in the windows. Id. A one square-foot sign is allowed on the door, however. Id. Subsection (g)(4) works in conjunction with subsection (g)(1), which provides that all exterior signs must be flat wall signs, and subsection (g)(2), which allows one square foot of sign area per foot of lot frontage on a street. Together, these provisions control the outward appearance of adults-only businesses.

We hold that the restrictions in subsection (g)(4) are narrowly tailored to further the city's significant interest in alleviating the adverse impact of sexually oriented businesses on their neighborhoods. Having before it substantial evidence of the urban blight caused by the mere presence of these businesses, the city could reasonably conclude that controlling their outward appearance would lessen the effect they would have on surrounding commercial and residential neighborhoods. The city could also reasonably conclude that sign and window regulations would be an appropriate means by which to achieve this purpose. See Young, 427 U.S. at 71 (noting that a "city must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems"). The sign and window restrictions do not reach substantially more speech than necessary, for they are directed only at the signs and window coverings that would affect the outward appearance of the businesses and impact the surrounding

10

neighborhoods.  See Ward, 491 U.S. at 799 n.7 (explaining that a regulation is narrowly tailored when its focus on the evils sought to be eliminated does not "restrict[] a substantial quantity of speech that does not create the same evils").

Excalibur challenges the reasonableness of the restrictions contained in subsection (g)(4) on several grounds.  Excalibur claims that it is unreasonable to prohibit window signs in favor of signs on a wall. Further, Excalibur claims that subsection(g)(4)'s prohibition of covered or opaque windows is inconsistent with subsection (g)(3)'s requirements that displays of merchandise or entertainment not be visible from the sidewalk.

We disagree that the sign and window restrictions are unreasonable. The city could reasonably have concluded that leaving the windows free of signs and coverings would enhance the outward appearance of, and therefore minimize the adverse effects caused by, sexually oriented businesses. Further, the city's regulations are not inconsistent, because Excalibur could avoid the visibility of its merchandise through unobstructed windows by turning its display stands so the merchandise does not face the windows.[4]  More importantly and to the point, we believe Excalibur invites us to strike down the city's means of furthering its objectives simply because the means may be imperfect.  We decline this invitation.  Although reasonable people might quibble about the extent to which the regulations serve the city's significant interests or about whether a better solution might be available, section 540.410(g)(4) is reasonably related to the city's significant objectives, and therefore "narrowly tailored" as that term of art

---

[4]At oral argument, the city explained that Excalibur (operated by Dennis Buchanan) could comply with both the display regulations in subsection (g)(3) and the requirement to leave windows unobstructed by signs or covers by placing the backside of a bookshelf against a window.  Dennis Buchanan, who operated Excalibur, was aware of this means of compliance, because he was present when the city inspector mentioned this to Buchanan's brother, who also operated an adults-only bookstore in Minneapolis.  Holmberg, 545 N.W.2d at 73.

11

is used in this context.  <u>Ward</u>, 491 U.S. at 800.

We have reviewed the cases Excalibur cites to support its claim and find them to be inapposite, because the regulations in them limit or ban speech based upon its content.  <u>See</u>, <u>e.g.</u>, <u>Boos v. Barry</u>, 485 U.S. 312, 329 (1988) (invalidating, as an impermissible content-based regulation, an ordinance prohibiting speech that was critical of certain foreign governments); <u>Metromedia, Inc. v. City of San Diego</u>, 453 U.S. 490, 515 (1981) (invalidating a sign ordinance banning certain signs by reference to their noncommercial content, but allowing signs expressing other noncommercial and commercial speech); <u>Linmark Assocs., Inc. v. Township of Willingboro</u>, 431 U.S. 85, 93-97 (1977) (invalidating a prohibition on "for sale" signs as a content-based regulation, because the purpose of the prohibition was to prevent people acting upon its content); <u>Gilleo v. City of Ladue</u>, 986 F.2d 1180, 1182-83 (8th Cir. 1993), (invalidating a sign regulation that disfavored certain types of noncommercial speech and rejecting a secondary-effects argument because the city made no showing that the prohibited signs caused any more problems than the permitted signs) <u>aff'd</u>, 512 U.S. 43 (1994); <u>Goward v. City of Minneapolis</u>, 456 N.W.2d 460, 465-66 (Minn. Ct. App. 1990) (invalidating an ordinance that banned signs expressing political views but allowed "for rent" signs, "for sale" signs, and campaign-related signs).  Here, however, we are looking at a content-neutral governmental interest in limiting adverse secondary effects.  The sign and window requirements are reasonably related to the city's significant governmental interest in minimizing urban blight.  <u>Cf. SDJ, Inc. v. City of Houston</u>, 837 F.2d 1268 (5th Cir. 1988) (holding that controls on the outward appearance of adults-only bookstores were content-neutral regulations narrowly tailored to serve significant governmental interests), <u>cert. denied</u>, <u>M.E.F. Enters., Inc. v. City of Houston</u>, 489 U.S. 1052 (1989).

Finally, we believe section 540.410 leaves open ample alternative avenues of communication.  Excalibur is free to communicate information on signs outside of its building, within the modest restrictions imposed under subsection (g).  The regulation

12

provides for a sign on the door and allows flat signs on the wall of the building, with only some reasonable limitations on their size. These alternative avenues of communication provide ample opportunity for Excalibur to express itself. In addition, Excalibur may communicate information inside the store, limited only in that merchandise may not be visible from the sidewalk on the street.

Having found that Minneapolis Code of Ordinances § 540.410(g)(4) is content-neutral, narrowly tailored to further a significant governmental interest, but also permissive enough to leave open alternative channels of communication, we hold that the ordinance is a constitutional regulation of the time, place, and manner of speech.

### B. Section 540.410(g)(3)

Excalibur mounts a facial challenge to Minneapolis Code of Ordinances § 540.410(g)(3), which prohibits the display of merchandise or pictures in window areas or any other area that is visible from the sidewalk in front of the adults-only businesses. Excalibur claims this provision is unconstitutionally overbroad.[5]

The overbreadth doctrine applies in the narrow context of facial challenges to legislation based upon free-speech rights. This doctrine represents a departure from

---

[5]The city claims that Excalibur's overbreadth challenge to section 5410.410(g)(3) is not properly before this court. Excalibur did not include its claim regarding subsection (g)(3) in its complaint and first briefed the issue in opposition to the city's motion for summary judgment. We believe the issue is properly before us, however, because the district court, apparently believing that the parties had impliedly consented to include it, addressed the issue on the merits. See Fed. R. Civ. P. 15(b) ("When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."). This belief on the part of the district court was reasonable because the city did not raise any procedural objections to Excalibur's overbreadth argument. Accordingly, the overbreadth issue has been preserved for appeal.

13

traditional standing rules, see Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (articulating the standing requirements), and allows a party like Excalibur to challenge an ordinance on the ground that the ordinance might be applied unconstitutionally to third parties whose actual circumstances are not before the court.  Bates v. State Bar of Ariz., 433 U.S. 350, 380 (1977).   The doctrine developed out of a recognition that an overly broad statute may chill protected speech and the conclusion that "the possible harm to society from allowing unprotected speech to go unpunished is outweighed by the possibility that protected speech will be muted."   Id.   Because the overbreadth doctrine has far-reaching ramifications, however, it is "`strong medicine' that should be employed only `with hesitation,' and then `only as a last resort.'"  Upper Midwest Booksellers Ass'n v. City of Minneapolis, 780 F.2d 1389, 1391 (8th Cir. 1985) (quoting New York v. Ferber, 458 U.S. 747, 769 (1982)).   To be facially invalidated under this doctrine, the overbreadth of an ordinance affecting both conduct and pure speech must be both "real" and "substantial" in relation to its "plainly legitimate sweep."  Ferber, 458 U.S. at 769-70; Broadrick v. Oklahoma, 413 U.S. 601, 615 (1973).   There is real and substantial overbreadth when there is "a realistic danger that the ordinance itself will significantly compromise recognized First Amendment protections of parties not before the [c]ourt."  Members of City Council v. Taxpayers for Vincent, 466 U.S. 789, 801 (1984).   We will not strike down a ordinance for overbreadth if its legitimate reach "dwarfs its arguably impermissible applications."  Ferber, 458 U.S. at 773.

Excalibur claims section 540.410(g)(3) is unconstitutionally overbroad.  Excalibur notes that some businesses classified as adults-only bookstores may have merchandise for sale that is not pornographic or sexually oriented.  See Minneapolis, Minn., Code of Ordinances § 540.410(b) (defining an "adults-only bookstore" as "[a]n establishment having as a substantial or significant portion of its stock in [materials] which are distinguished or characterized by their principal emphasis on [sexually oriented matters], or an establishment with a segment or section devoted to the sale or display of such material . . . .").  Excalibur further points out that subsection (g)(3)

14

prohibits the display of <u>any</u> merchandise or pictures in a manner that would be visible from the sidewalk in front of the business. Thus, Excalibur maintains, subsection (g)(3) is overbroad in that it conceivably prohibits the display of merchandise such as a Walt Disney video or the Holy Bible. Excalibur asks us to strike down this provision for the sake of third parties whose constitutionally protected speech may be chilled by subsection (g)(3).

Based upon a narrow construction of the ordinance, the district court found that § 540.410(g)(3) is not overbroad. "It has long been a fundamental tenet of First Amendment law that in determining a facial challenge to a statute, if it be `readily susceptible' to a narrowing construction that would make it constitutional, it will be upheld." <u>Virginia v. American Booksellers Ass'n</u>, 484 U.S. 383, 397 (1988). Here, the district court upheld subsection (g)(3) on the basis that the ordinance would prohibit the visibility only of sexually oriented materials. Excalibur contends the district court's construction is untenable, however, because the Minnesota Court of Appeals has considered an overbreadth challenge to this provision and did not construe section 540.410(g)(3) narrowly. <u>See</u> <u>State v. Holmberg</u>, 545 N.W.2d 65, 70 (Minn. Ct. App. 1996).

We reject Excalibur's contention that the Minnesota Court of Appeals made no effort to construe the ordinance narrowly. In <u>Holmberg</u>, the court addressed Excalibur's overbreadth argument in the context of a criminal appeal arising from the same facts as this action. The court described the speech at issue as commercial and adult (sexually oriented) speech. Noting the Supreme Court's statements that these categories of speech are entitled to only limited First Amendment protection, the Minnesota Court of Appeals held that subsection (g)(3) was not overbroad. <u>Id.</u> at 70. While the court did not explicitly state it was construing subsection (g)(3) narrowly, the reasoning in its opinion rests on the assumption that subsection (g)(3) applies to only commercial and sexually oriented speech. The court's opinion certainly did not anticipate the ordinance prohibiting displays of materials outside the scope of these two

15

narrow categories of speech.  Accordingly, we will likewise construe the provision as applying only to displays of commercial speech and sexually oriented speech.

To the extent that subsection (g)(3) prohibits the display of commercial speech, that is, speech that "does no more than propose a commercial transaction," Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 762 (1976) (internal quotations omitted), the ordinance withstands Excalibur's overbreadth challenge.  Commercial speech, as "the offspring of economic self-interest, is a hardy breed of expression that is not particularly susceptible to being crushed by overbroad regulation." Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y., 447 U.S. 557, 564 n.6 (1980).  "[B]ecause the profit motive is thought to be sufficiently compelling to enable such speech to withstand the chilling effect of an overbroad statute," we have noted that the overbreadth doctrine does not apply to commercial speech. Garner v. White, 726 F.2d 1274, 1277 (8th Cir. 1984); see also Waters v. Churchill, 511 U.S. 661, 670 (1994) (noting that the Supreme Court has not extended the overbreadth doctrine to the commercial context); Ohralik v. Ohio State Bar Ass'n, 436 U.S. 447, 462 n.20 (1978) (stating that because it is not as likely to be deterred as noncommercial speech, commercial speech does not require the protection of the overbreadth doctrine); Bates, 433 U.S. at 380-81 (explaining that "the justification for the application of overbreadth analysis applies weakly, if at all, in the ordinary commercial context"); Van Bergen, 59 F.3d at 1549-50 (rejecting an overbreadth argument because the affected third-party commercial entities were capable of bringing the constitutional claim themselves and because the statute would not likely chill their speech).  Likewise, in this case, we decline to apply the "strong medicine" of the overbreadth doctrine to strike down subsection (g)(3) for the sake of third parties' commercial speech.  Ferber, 458 U.S. at 769.

What remains then is subsection (g)(3)'s restriction on the display of sexually oriented materials.  As we already explained above in addressing Excalibur's challenge to the sign and window restrictions in subsection (g)(4) of the ordinance, section

16

540.410 is a content-neutral regulation, enacted to further the city's significant interest in limiting the urban blight caused by adults-only businesses. The restriction in subsection (g)(3) prohibiting the visibility of sexually oriented speech through the windows of these establishments falls within the legitimate sweep of the ordinance. Thus, there is nothing overbroad about subsection (g)(3)'s regulation of displays of sexually oriented speech.

Because commercial speech does not warrant the protection of the overbreadth doctrine and sexually oriented speech is legitimately regulated by the ordinance, we will not strike down section 540.410(g)(3) as unconstitutionally overbroad. Cf. Upper Midwest Booksellers Ass'n, 780 F.2d at 1391-94 (rejecting overbreadth challenge to an ordinance creating restrictions on displays of any material that is "harmful to minors").

## III.

For the above reasons, we affirm the judgment of the district court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

17